UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

In re

JARETT R. LEZDEY             Case No. 8:05-bk-08711-KRM
                             Chapter 11
     Debtor.
_____/


In re

DARREN B. LEZDEY             Case No. 8:05-bk-08716-KRM
                             Chapter 11
     Debtor.
_____/

## MEMORANDUM OPINION AND ORDER ON MOTIONS TO DISMISS

It is well-settled that the court may dismiss a Chapter 11 case, thus pre-empting the plan approval process, if the debtor is unable to achieve confirmation or if the petition itself was filed for an improper purpose, such as filing to halt a creditor's collection efforts without the intent or ability to reorganize.

The debtors in these cases are subject to the same $17.4 million Arizona state court judgment held by Allen Wachter, M.D., and two corporate affiliates (collectively, "Wachter").[1] The petitions were filed on the same day, on the eve of a hearing in Florida state court to determine Wachter's challenges to the debtors' claims of homestead exemptions and to alleged fraudulent transfers. Each debtor listed no pre-petition income, few quantifiable non-exempt assets, and few creditors other than Wachter.

---

[1] The Wachter affiliates are Seth Chemicals, Inc., and Nathan Technologies, Inc.

Later, the debtors filed substantially similar plans (and amended plans) which would allow them to retain their exempt and non-exempt assets while offering to pay creditors no specific amount of money, but rather for promises of future payments based on such net income as they may derive from future earnings from certain defined "business operations." Because the debtors would have no firm obligation to earn anything and because they have pre-petition histories of living on virtually no earned income, their promises of payment are illusory. Accordingly, for the reasons stated in more detail below, the Court grants Wachter's motions to dismiss each case.

## BACKGROUND

The Debtors

Darren Lezdey and his brother, Jarett, are controlling officers of AlphaMed Pharmaceuticals, Corp. ("AlphaMed"). AlphaMed was formed in 1999 to develop various bio-tech patents.[2] The debtors have worked for AlphaMed since its formation, but neither has received any salary for the two years prior to filing these cases.[3] In October 2000, each of the debtors transferred all of their AlphaMed stock to an entity controlled by the Lezdey family, known as Jamie Holding Company, LLC ("Jamie Holding").[4]

---

[2] One such patent, for the manufacture of alpha-one antitrypsin using yeast cultures instead of blood serum, was invented by debtor Darren Lezdey and his father, John Lezdey. This Court has ruled in a separate case, that AlphaMed's acquisition of this patent was a voidable transfer. Brook v. AlphaMed Pharmaceuticals, Corp. (In re J&D Sciences, Inc.), M.D. Fla., Adversary Proceeding No. 8:04-ap-00517-KRM. AlphaMed apparently holds or is developing other patents, including one for the process of infusing a certain anti-microbial agent into various household products.

[3] Their schedules state that AlphaMed owes each of them "$70,000/yr. since Feb. 2001" in accrued, but unpaid wages.

[4] The Operating Agreement for Jamie Holding was signed by the debtors, their father, John, and their mother, Noreen.

For the past four or more years, the Lezdey family has been engaged in litigation with Wachter regarding the ownership and control of certain bio-tech companies, ventures and patents.[5] In February 2002, Wachter obtained a $17.4 million judgment in Arizona state court against each of the debtors, their father, John Lezdey, and J&D Sciences, Inc.[6] The debtors have argued that the Arizona judgment is nothing more than a "default" judgment which should be set aside; the record establishes, however, that each of the debtors filed an answer and appealed the judgment, which was affirmed by the Arizona appellate court. Thus, for purposes of the pending motions to dismiss, the Court considers Wachter to be an unsecured creditor holding a $17.4 million claim plus attorneys' fees and pre-petition accrued interest.[7]

The Florida Collection Proceedings

Prior to these bankruptcy cases, Wachter had filed proceedings supplementary in Pinellas County, Florida, pursuant to Section 56.29, Florida Statutes, to collect on the Arizona judgment.[8] The Florida court conducted several days of evidentiary hearings, in which Wachter was seeking to challenge both of the debtors' claim of homestead exemption and to avoid, as fraudulent transfers, each brother's transfer of his interest in AlphaMed to Jamie Holding. These matters were scheduled for a final day of trial on

---

[5] Lawsuits are pending in Arizona, the Northern District of California, the Southern District of Florida, and Pinellas County, Florida.

[6] The judgment awarded compensatory damages of $11,629,966, and punitive damages of $5,814,983; attorneys' fees of $425,000 were also awarded.

[7] Wachter filed proofs of claim in each case in the amount of $23,541,561.54.

[8] *Allan Wachter, M.D. v. John Lezdey, et al.*, Case No. 02-4683-CI, pending in the Circuit Court for Pinellas County, Florida (the "State Court").

May 2, 2005. The proceedings were stayed by the filing of the petitions in these cases on April 29, 2005.

The Chapter 11 Cases

The brothers' Chapter 11 petitions were filed on the same day. Thereafter, they filed substantially similar schedules, statements of financial affairs, and monthly operating reports. Incredibly, the financial disclosures reflect that each of the debtors have substantially the same financial picture.

The debtors' bankruptcy schedules and the claims registers in these cases establish that the debtors have few creditors, whose claims are relatively small in relation to Wachter's claim. In each case, Wachter's claim represents more than 98% of the unsecured claims:

```
Darren Lezdey
Priority:      I.R.S.                          $       90, 972
Other:                                         $             0
Unsecured:*    3 credit cards                  $        15,166
Wachter:                                       $    17,144,949
```

    *   All unsecured claims were disputed; proofs of claims were filed only by the I.R.S. (a $243,834.95 priority claim) and Wachter ($23,541,561.54).

```
Jarett Lezdey
Priority:      Fla. Dept. of Revenue           $             0
Unsecured:*    Bank of America                 $        26,561
               Car Loan—deficiency             $         2,568
               2 credit cards                  $        42,869
               Other                           $         3,299
Wachter:                                       $    17,144,949
```

    *   All unsecured claims were disputed; proofs of claims were filed only by Hands, Inc. ($3,331.28), T-Mobile ($143.19), Chase Bank ($0.37), and Wachter ($23,541,561.54).

4

Darren's listed assets include a townhouse, owned free and clear, valued at $365,000, tangible personal property valued at $685.64, and intangible assets of unknown value, including his interests in Jamie Holding and a Wachter affiliate known as Arriva Pharmaceuticals, and in causes of action against Wachter and related entities.

Likewise, Jarett listed a townhouse, owned free and clear, also valued at $365,000, tangible personal property valued at $280.64, and intangible assets of an unknown value, including his interests in Jamie Holding and Arriva Pharmaceuticals, and in causes of action against Wachter and related entities. Each debtor also listed $291,666 in accrued but unpaid salary due from AlphaMed.

The testimony and statements of financial affairs establish that Darren had no income from January 1, 2005, through the date he filed his Chapter 11 petition and no income in 2003 and 2004; he had only $500.00 in 2002; and only $2,000.00 in 2001. Jarrett had no income from January 1, 2005, through the date he filed his Chapter 11 petition and no income in 2003 and 2004; only $1,500.00 in 2002; and only $2,000.00 in 2001.

Each debtor has an interest in Jamie Holding, which owns or controls patents and patentable rights which are being marketed by Dougal Investment Corp. ("Dougal"), a company owned by the debtors' mother.[9] When questioned at trial, the debtors were unable to state the value of the assets that they had transferred to Jamie Holding, the

---

[9] The Court notes that the deposition testimony of the debtors' mother, Noreen Lezdey, indicates that she does not know what Dougal does: she thought it was a real estate company whose purpose was buying and renovating real estate. Apparently, without her knowledge, it has been reinvented as a marketing company for patents owned by the companies that are, in turn, owned by Jamie Holding.

percentage of ownership interests in Jamie Holding that they had received for the transfers, or the value of their respective ownership interests in Jamie Holding.

The Chapter 11 Plans

On July 15, 2005, the debtors filed substantially similar plans of reorganization (the "Initial Plans"). On August 25, 2005, in the midst of the evidentiary hearing on Wachter's motions to dismiss, they filed substantially similar plan amendments (the "Amended Plans").

Under the Initial Plans, the debtors proposed that they would retain their interests in all exempt and non-exempt assets in exchange for future cash payments to creditors. Among other things, the Initial Plans separately classified Wachter (Class 4) from other unsecured creditors (Class 5): Wachter would receive quarterly payments over 5 years equal to 90% of "Net Disposable Income;" the Class 5 creditors would receive quarterly payments over 5 years equal to 10% of "Net Disposable Income."[10]

The debtors define "Net Disposable Income" as "any and all monies earned by the Debtor from the Debtor's Business Operations…net of the Debtor's reasonable living expenses, along the lines of the expenses set forth on…Schedule J."[11] The "Debtor's Business Operations"—the ultimate source of funding for each plan—is defined as "the work the Debtor performs for anticipated monetary remuneration." This is stated to

---

[10] Scheduled unsecured claims, excluding Wachter's claim, total $49,631.48 in Darren's case and $75,304.02 in Jarett's case, were all listed as "disputed." The unsecured claims actually filed, excluding Wachter's claims, were substantially less—$0 in Darren's case and only $3,474.84 in Jarett's case.

[11] The Schedule J's listed monthly expenses of $1,393.95 for Darren and $1,293.62 for Jarett; but, the post-petition monthly reports reveal substantially lower monthly expenses.

6

include "work" performed for Dougal, Jamie Holding, AlphaMed, and a company known as Press Ex.

The Amended Plans provide for a valuation by the court of the debtors' interests in Jamie Holding. Under the Amended Plans, the debtors would have the right to "redeem" those interests by paying creditors the court-determined values over five years; alternatively, if unable to pay the redemption amount, the debtors would surrender their interests in Jamie Holding to creditors. The Amended Plans provide further that all claims against the debtors would be discharged and released in exchange—not for actual payment—but for the "rights afforded...by and through [the] Plan."

Although, the debtors had virtually no income for several years before they filed Chapter 11, both debtors project net disposable income for the first year of the plans as $106,948.56.[12] The debtors estimate that the commissions they will receive for their work performed for Dougal and Press Ex will provide income sufficient to generate approximately $707,000.00 in plan payments, by each debtor, over the next five years.

## DISCUSSION

Section 1112(b) of the Bankruptcy Code allows a court to dismiss or convert a bankruptcy case where the petition has been filed for an improper purpose, or in "bad faith." *In re Singer Furniture Acquisition Corp.*, 254 B.R. 46 (M.D. Fla. 2000). To determine whether to dismiss for bad faith, courts have considered whether the debtor has: (1) only a single asset; (2) few employees, if any; (3) lack of adequate cash flow; (4) inadequate sources of income to sustain a plan of reorganization; (5) few unsecured

---

[12] Each of these individual debtors project the same quarterly incomes throughout the life of the plan. This is unbelievable considering the salaries are based largely on projected commissions, an inherently contingent source of income.

7

creditors whose claims are relatively small; (6) a dispute with one other creditor; and (7) engaged in wrongdoing. *See In re Phoenix Piccadilly, Ltd.*, 849 F.2d 1393 (11th Cir. 1988); *In re Natural Land Corp.*, 825 F.2d 296, 297 (11th Cir. 1987); *In re Little Creek Development Co.*, 779 F.2d 1068, 1073 (5th Cir. 1986). The lack of a meaningful number of unsecured creditors in relation to the indebtedness owed to one major creditor is also a factor in deciding whether the Chapter 11 case was filed in bad faith. *In re Krilich*, 87 B.R. 178, 181-182 (Bankr. M.D. Fla. 1988).

The overriding consideration is proof of "an intent to abuse the judicial process and the purposes of the reorganization process." *Natural Land*, 825 F.2d at 298; *In re Albany Partners, Ltd.*, 749 F.2d 670, 674 (11th Cir. 1984). *See also In re Star Trust*, 237 B.R. 827, 834, n. 3 (Bankr. M.D. Fla. 1999) ("'[T]he real test that still remains is the presence of honest intention of the debtor and some real need and real ability to effectuate the aim of the reorganization ...'" (citations omitted)); *In re Springs Plaza Associates, L.P.*, 188 B.R. 48, 49 (Bankr. M.D. Fla. 1995) ("In the last analysis, the key considerations are (1) the debtor's motivation to file the petition; (2) the economic vitality of the debtor; (3) the debtor's real need to reorganize; and (4) the ability of the debtor to achieve reorganization").

A Chapter 11 case may also be dismissed or converted for "cause" if the debtor lacks the ability to effectuate a plan. 11 U.S.C. §1112(b)(2). Dismissal under Section 1112(b)(2) is appropriate when a court determines that it is unreasonable to expect that a

8

plan can be confirmed within a reasonable amount of time. *In re Woodbrook Assoc.*, 19 F.3d 312, 316-17 (7th Cir. 1994).[13]

After hearing the testimony of the debtors in these cases, assessing their demeanor and credibility, and considering the documentary evidence and other matters of record in these proceedings, the Court finds that each of the debtors filed their respective Chapter 11 cases in bad faith and that these cases should be dismissed for "cause" under Section 1112(b) of the Bankruptcy Code.

These cases represent a two-party dispute between each of the debtors and Wachter. The fact that these cases were filed on the eve of a potentially decisive hearing in the Florida proceedings supplementary, leads to the inescapable conclusion that the filings were solely to delay the debtors' common creditor, Wachter.

Although the debtors testified that they filed their cases because of pressure they were receiving from various creditors, the debts owed to these other creditors were incurred up to several years before these cases were filed.[14] As it turned out, no creditors other than Wachter and the I.R.S. filed claims in Darren's case; only 3 creditors (totaling approximately $3,475) and Wachter filed claims in Jarett's case. No creditor, other than Wachter, had commenced litigation against either debtor to collect any debt.

---

[13] A creditor need not wait until the debtor proposes a plan or until expiration of the exclusivity period to move for dismissal. *Natural Land*, 825 F.2d at 297; *Woodbrook*, 19 F.3d at 317. *See also In re Johnston*, 149 B.R. 158, 162 (9th Cir. B.A.P. 1992) ("[W]here there is no reasonable possibility of an effective reorganization, the bankruptcy court is not compelled to wait a certain period of time, to the detriment of creditors, before ordering conversion of the case."); *Stage I Land Co. v. U.S. Dept of H.U.D.*, 71 B.R. 225, 231 (D. Minn. 1986) (court should dismiss a Chapter 11 case at the outset for cause where there is no reasonable possibility of a reorganization); *In re Economy Cab & Tool Co., Inc.*, 44 B.R. 721, 724 (Bankr. D. Minn. 1984) (Court may convert case in its early stages where movant shows that there is "no more than a 'hopeless and unrealistic prospect' of rehabilitation").

[14] For example, the unsecured claims in Jarett's case: the proof of claim filed by Hands, Inc., stemmed from a June 20, 1996 judgment, and the T-Mobile claim stemmed from a debt incurred December 5, 1999. The I.R.S. priority claim in Darren's case is for the tax years 1991 and 1992.

It is a reasonable inference that either: (a) the scheduled debts were in default for some time, but there was no real creditor pressure; or (b) that the debtors allowed these debts to go into default shortly before filing their petitions, to give the appearance that there are other creditors to be treated as "impaired: by their plans. In any event, as of the petition date, Wachter was the only creditor pressing the debtors with litigation. Where two brothers file for Chapter 11 relief on the same day, with virtually the same financial position, in an attempt to discharge the same $17.4 million judgment, their explanation of filing to resolve other debts is not credible.

The debtors could not explain why they were in Chapter 11 versus Chapter 7, except to refer to privileged advice of their attorney. They testified that they needed breathing room from creditors so that they could, at last, develop products and marketing opportunities for Jamie Holding, Dougal, and AlphaMed. These Chapter 11 cases, however, are not necessary for the development of those products. If all the debtors needed was breathing room from debt collection and a discharge from their debts, they could have achieved that in a Chapter 7 case. They can generate commission income regardless of whether they are in Chapter 11 or Chapter 7. The Court concludes that the Chapter 11 filings were intended to frustrate Wachter's debt collection efforts while maintaining control of the intangible assets, which a Chapter 7 trustee would have offered for sale.

The Court further finds that the debtors are not able to reorganize. The Amended Plans can never be confirmed because the debtors cannot meet the best interests of creditors test of Section 1129(a)(7)(ii) of the Bankruptcy Code. That would require proof that Wachter will receive at least as much under the Amended Plans as he would under

Chapter 7 liquidation. Among other things, there is no way to determine the value of the intangible assets, particularly the debtors' respective interests in Jamie Holding.

The debtors' plan amendments—to redeem their interests in Jamie Holding for future cash payments over 5 years—is a non-starter as well. The Court would never be able to determine the values of the debtors' interests in Jamie Holding because the debtors themselves were unable or unwilling to state the nature or extent of their interests.

The Amended Plans also violate the requirements of Section 1129(a)(10) of the Bankruptcy Code because the plans impermissibly classify the unsecured claim of Wachter in Class 4 and the other unsecured claims in a separate Class 5. There is no justification for this "gerrymandering," other than the creation of an impaired class of creditors (Class 5) who may vote for the plans. *In re Holly Garden Apts.*, 223 B.R. 822, 825 (Bankr. M.D. Fla. 1998) (similar claims may be classified separately only for a legitimate reason).

The most perplexing aspect of the debtors' plans is that there is no requirement that the debtors pay any specific sum to retain their assets and receive their discharge. They only have to pay an unliquidated amount that is contingent on earnings from certain defined enterprises. They do not ever have to achieve any income from such earnings. This is particularly troubling because the debtors had virtually no earnings and lived on "bare bones" expenses for two to four years before the Chapter 11. During that time they received funding from their parents. In effect, the debtors' earned income can be turned on and off at the will of the debtors and their family.

Under the Amended Plans the debtors would not have to pay a penny if they have no earnings; yet they would be able to retain their interests in all assets and be released from Wachter's claim. After confirmation, the debtors could choose not to work (i.e., receive no earned income) like they did for several years before filing their Chapter 11 petitions. Thus, they could elect to have no "Net Disposable Income" to pay creditors, while being in full compliance with their plans.

## CONCLUSION

The Court, after hearing the testimony of the debtors, assessing their demeanor and credibility, and considering the documentary evidence and other matters of record in these proceedings, finds that the debtors filed their Chapter 11 cases in bad faith. It is apparent that these cases were filed solely to delay and frustrate the efforts of their common creditor, Wachter. Accordingly, these cases will be dismissed for "cause" under Section 1112(b) of the Bankruptcy Code.

It is hereby,

ORDERED:

1. The Motion to Dismiss the case of Jarett R. Lezdey, Case No. 8:05-bk-08711-KRM, is hereby granted. Jarett R. Lezdey shall have ten (10) days from the date of this Order to seek a conversion of his Chapter 11 case to a case under Chapter 7. If he does not seek to convert his case within the prescribed time, then Case No. 8:05-bk-08711-KRM will stand dismissed without any further order of this Court;

2. The Motion to Dismiss the case of Darren B. Lezdey, Case No. 8:05-bk-08716-KRM, is hereby granted. Darren B. Lezdey shall have ten (10) days from the date of this Order to seek a conversion of his Chapter 11 case to a case under Chapter 7. If he

does not seek to convert his case within the prescribed time, then Case No. 8:05-bk-08716-KRM will stand dismissed without any further order of this Court;

3. All pending hearings in both of the debtors' cases are hereby cancelled;

4. The Defendants in Adversary Case No. 8:05-ap-00240-KRM filed by Jarett R. Lezdey and the Defendants in Adversary Case No. 8:05-ap-00239-KRM filed by Darren B. Lezdey are hereby excused from filing any responses in these adversary proceedings. If these bankruptcy cases are converted to cases under Chapter 7 by the debtors, then the Court will schedule a pretrial hearing in the adversary proceedings.

DONE and ORDERED in Tampa, Florida on this 18th day of October, 2005.

K. Rodney May
United States Bankruptcy Judge

Copies furnished to:

Edwin G. Rice, Esq., P.O. Box 3333, Tampa, FL  33602
Steven M. Berman, Esq., 401 South Florida Avenue, Suite 300, Tampa, FL 33602
Jarett R. Lezdey, 140 Marcdale Boulevard, Indian Rocks Beach, FL 33785
Darren B. Lezdey, 148 Marcdale Boulevard, Indian Rocks Beach ,FL 33785